IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DOROTHEA REYNOLDS,

          **Plaintiff,**

   vs.                             Civil Action 2:11-cv-277
                                              Judge Marbley
ROBERT W. SMITH, *et al.,*                 Magistrate Judge King

          **Defendants.**


## REPORT AND RECOMMENDATION

    Plaintiff, formerly an inmate at the Ohio Reformatory for Women ("ORW"),[1] brings this action under 42 U.S.C. § 1983 alleging that defendant Corrections Officer Robert W. Smith sexually assaulted her and that the remaining defendants failed to protect her in violation of plaintiff's rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. This matter is now before the Court on *Defendants' Motion for Summary Judgment As It Pertains to the Mandatory Precondition of Exhaustion of Administrative Remedies Pursuant to the Prison Litigation Reform Act ("PLRA") of 42 U.S.C. § 1997e*, ECF 98 ("*Motion*"). For the reasons that follow, it is **RECOMMENDED** that the *Motion* be **DENIED**.[2]

---

[1] Plaintiff is currently under Adult Parole Authority ("APA") supervision in Cleveland, Ohio.

[2] Because the Court can resolve the *Motion* on the parties' filings, plaintiff's request for oral argument, *see Plaintiff Dorothea Reynolds's Brief in Opposition to the Defendants' Motion for Summary Judgment*, ECF 106, p. i (pagination appearing at bottom of the page) ("*Opposition*"), is denied.

I.    **BACKGROUND**

A.    **ODRC Policy Prohibiting Unauthorized Relationships**

The Ohio Department and Rehabilitation and Correction ("ODRC") has promulgated a policy in order "to establish the mandate that department employees, contractors and volunteers maintain a professional relationship with all persons under the supervision of the Department of Rehabilitation and Correction and that any relationship other than a professional relationship [] be properly reported and authorized."  ODRC Policy Number 31-SEM-07, ECF 101-2, p. 1 ("Unauthorized Relationships Policy").  Unauthorized relationships include sexual misconduct, sexual contact and sexual assault, which are defined as the following:

> **Sexual Misconduct –** Any behavior or act of a sexual nature directed toward an offender by an employee, volunteer, visitor or agency representative.  This includes acts or attempts to commit such acts including, but not limited to, sexual assault, kissing, sexual harassment, sexual contact, conduct of a sexual nature or implication, obscenity and unreasonable invasion of privacy.  Sexual misconduct also includes, but is not limited to, conversations or correspondence which suggests a romantic or sexual relationship between an offender and any party mentioned above.

> **Sexual Contact –** Includes, but is not limited to, all forms of sexual contact, intentional sexual touching or physical contact in a sexual manner, either directly or through clothing, of the genitalia, anus, groin, breasts, inner thighs, buttocks, with or without the consent of the person; or any unwanted touching with intent to arouse, humiliate, harass, degrade or gratify the sexual desire of any person.

> **Sexual Assault -** Any contact between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion of any part of the body of one person, or of any object into the sex organ, mouth or anus of another

2

person, by the use of force or threat of force.
*Id.* "Engaging in an unauthorized relationship may result in employment termination and or termination of the contractual or volunteer status." *Id.* at 2. "Any employee, contractor or volunteer who becomes aware of or reasonably suspects that another employee, contractor or volunteer is involved in an unauthorized relationship has an affirmative duty to immediately report any such knowledge or suspicion[.]" *Id.* at 3. An employee's failure to report such knowledge or an employee's withholding of information "may be subject to disciplinary action, up to and including removal." *Id.* at 4.

The Unauthorized Relationships Policy specifically requires that inmates be advised during orientation that unauthorized relationships are prohibited. *Id.* at 3. The inmates "will be instructed on the procedure for reporting unauthorized relationships. This information shall also be included in the inmate handbook/manual." *Id.* "Inmates may report any knowledge or suspicion of an unauthorized relationship to any staff member." *Id.* at 4. The Unauthorized Relationships Policy requires that this reported information be immediately communicated to one of the following: the Inspector of Institutional Services, the Investigator, or the Managing Officer. *Id.*

**B.  Reporting Staff Behavior and the Inmate Grievance Procedure**

In November 2008, shortly after she was first incarcerated at the ORW, and in May and August 2009, plaintiff received a copy of an inmate handbook, which had to be returned within 14 days of receipt. ECF 98-2, PAGEID#:1047-1050 (copies of "Inmate Orientation

3

Checklist"). The inmate handbook instructs inmates to immediately report sexual assaults to a prison staff member:

> **INMATE ON INMATE SEXUAL ASSAULT (Department Policy 79-ISA-01)**
>
> \*                    \*                    \*                    \*
>
> - If you are intimidated or are in fear of a sexual assault from another inmate immediately report this to a staff member or more than one staff member if necessary. You may also kite the investigator directly or any other staff member you feel comfortable reporting this to.
>
> - If you are sexually assaulted, immediately report it to a prison staff member. Do not clean yourself, brush your teeth, wash your clothes or do anything else that could destroy evidence of the assault. The sooner you report the assault the better the chances evidence can be obtained that will help prove the assault.

*The Ohio Reformatory for Women Inmate Handbook*, ECF 98-5, p. 9 ("Inmate Handbook"). *See also Deposition of Marta Raneri*, ECF 103-1, p. 44 ("*Raneri Deposition*") (testifying that the same reporting rules apply regardless of whether the sexual assault is inmate-on-inmate or staff-on-inmate).[3] "All reported sexual assaults will be reported to the Ohio State Highway Patrol. Each case will also be administratively investigated." Inmate Handbook, p. 10. *See also Deposition of Warden Sheri Duffey*, ECF 105-1, pp. 52-53 (agreeing that the only way the Ohio State Highway Patrol becomes involved in sexual assault investigations is if the prison contacts the Patrol) ("*Duffey*

---

[3] Ms. Raneri is ODRC's Inspector of Institutional Services at the ORW whose duties include monitoring the application and disposition of the inmate grievance procedure at the ORW. *Declaration of Marta Raneri*, ECF 98-2, PAGEID#:1046, ¶¶ 3-4, 8 ("*Raneri Declaration*").

*Deposition*").[4]  ORW's policy is that as soon as a matter becomes a criminal matter or could be a criminal matter, ORW's administrative rules, regulations, policies and procedures cease and the Ohio State Highway Patrol takes over the matter.  *Deposition of Cynthia Bartlett*, 101-1, pp. 45-47 ("*Bartlett Deposition*).[5]

The Inmate Handbook goes on to advise that "[i]nmates who feel they are victims of inappropriate supervision shall utilize the inmate grievance procedure in accordance with Administrative Regulation 5120-9-31."  Inmate Handbook, p. 10.  "A grievance is a complaint about a violation of an Administrative Rule or Department Policy by the institution or institutional staff that negatively affects the inmate."  *Id.*  All inmates in ODRC's custody are given both written and oral instructions on how to use the inmate grievance procedure.  *Declaration of Eugene Hunyadi*, ECF 98-1, ¶ 7 ("*Hunyadi Declaration*").[6]  In November 2008, shortly after she was first incarcerated at the ORW, and in May and August 2009, plaintiff received oral and written instructions on the use of the inmate grievance procedure.  *Raneri Declaration*, ¶ 8; *Exhibit A*, ECF 98-2, PAGEID#:1047 ("Inmate Orientation Checklist," bearing plaintiff's signatures dated November 7 and 12, 2008, and reflecting that she received verbal and written explanations of the grievance system); *Exhibit B*, ECF 98-2, PAGEID#:1048 ("Inmate Orientation Checklist," bearing plaintiff's

---

[4] Defendant Duffey was ORW's Warden between November 2007 and early June 2009. *Id.* at 6.
[5] Defendant Cynthia Bartlett is an investigator for ORW.  *Id.* at 6.
[6] Mr. Hunyadi is an ODRC Assistant Chief Inspector whose job duties include handling inmate appeals and grievances.  *Id.* at ¶ 2.  He also serves as the custodian for inmate appeals and direct grievances.  *Id.*

signature dated November 24, 2008 and reflecting the same); *Exhibit C*, ECF 98-2, PAGEID#:1049 ("Inmate Orientation Checklist," bearing plaintiff's signature dated May 1, 2009 and reflecting the same); and *Exhibit D*, ECF 98-2, PAGEID#:1050 ("Inmate Orientation Checklist," bearing plaintiff's signature dated August 13, 2009 and reflecting the same), attached thereto.

The inmate grievance procedure contains three steps. Inmate Handbook, pp. 10-12 (including filing an informal complaint resolution, notification of grievance and appeal of the inspector's disposition of the grievance).[7] However, the Inmate Handbook identifies situations where behavior could be reported directly to staff or a supervisor. *Id*. at 10, 12. For example, "[i]n the event an inmate feels the staff persons [sic] inappropriate behavior is illegal or may jeopardize their safety, this should be reported immediately to your unit staff or supervisor." *Id*. at 10. In addition, "[s]ome complaints need quick action, such as if you were physically harmed, or have experienced an unreported sexual assault or use of force." *Id*. at 12. *See also Duffey Deposition*, pp. 23-25 (explaining that an informal complaint, the first step in the grievance procedure, may be verbal); *Raneri Deposition*, p. 39 (confirming that a report of sexual assault is something that requires immediate attention). Under these circumstances, inmates were instructed to "let a supervisor know and then tell the Inspector. If you experience inappropriate supervision or retaliation, contact the

---

[7] This three-step procedure is described more fully *infra*.

6

Inspector directly" who may then advise the inmate "to file a
grievance instead of starting with an Informal Complaint Resolution."
Inmate Handbook, p. 12.  Ms. Raneri has never received a notification
of grievance regarding a sexual assault and defendant Duffey does not
recall an inmate using the grievance procedure to complain about
sexual misconduct.  *Raneri Deposition*, p. 38; *Duffey Deposition*, pp.
50, 56.

During inmate orientation, Ms. Raneri also gave inmates,
including plaintiff, a copy of a sexual assault awareness pamphlet to
keep in the inmate's cell; she also provided verbal instructions
regarding the pamphlet and sexual assault awareness and reporting such
assaults.  *Raneri Deposition*, pp. 31-34, 36; ECF 103-2, PAGEID#:1370-
1371 (copy of sexual assault awareness pamphlet).  This pamphlet
advises inmates that "[i]f you have been attacked or witness an
attack, but are unwilling to report it to institutional staff," the
inmate may call and leave a message for central office staff who check
the messages daily.  ECF 103-2, PAGEID#:1371.  Ms. Raneri also
specifically advises inmates during orientation how to report sexual
assault:

> If you are being intimidated or in fear of a sexual assault
> from another inmate, immediately report this to a staff
> member or more than one staff member if necessary.  You may
> also kite the inspector directly or any other staff member
> you feel comfortable reporting this to.  You may also
> utilize the inmate grievance procedure.

*Ohio Department of Rehabilitation and Correction Female Inmate Sexual
Assault Orientation*, ECF 103-2, PAGEID#:1375.  *See also Raneri*

*Deposition*, pp. 39-41 (testifying that she goes over these various reporting options with inmates during orientation).

Inmates were also advised at orientation that they may report sexual assaults by calling a hotline, which may be called directly from any inmate phone at no cost. *Deposition of Ginine M. Trim*, ECF 104, pp. 42, 111 ("*Trim Deposition*").[8] The hotline was listed on notices posted in all ORW housing units. *Id.* at 42; *Raneri Deposition*, p. 31; ECF 101-2, PAGEID#:1185 (copy of poster, which provides the hotline number and states, in part, "Sexual Assault Is An Act of Violence. . . Reporting Sexual Assault Is A Step On The Road To Recovery. . ." and that the hotline "[m]ay be called direct from any inmate phone at no cost").

In short, there are multiple "mechanisms," "formal and informal reporting structures," for reporting sexual assaults at ORW: (1) tell a staff member; (2) kite an inspector or investigator; (3) call a hotline; or (4) provide a written or verbal informal complaint resolution or grievance. *See*, *e.g.*, *Trim Deposition*, pp. 36-37 (testifying that she spoke to inmates about "reporting mechanisms" for reporting sexual assaults), 41 (testifying that she "certainly talked to them [inmates] about formal and informal reporting structures"); Inmate Handbook, pp. 9, 11-12; *Raneri Deposition*, pp. 24, 31-34, 36, 41; *Bartlett Deposition*, p. 25; ECF 103-2, PAGEID#:1371 (pamphlet); ECF 101-2, PAGEID#:1185 (poster); *Ohio Department of Rehabilitation*

---

[8] Defendant Trim was named ORW's temporary Warden in June 2009 and officially became ORW's Warden in August 2009. *Id.* at 6, 17.

*and Correction Female Inmate Sexual Assault Orientation*, ECF 103-2, PAGEID#:1375.  These procedures were designed to make the reporting of a sexual assault to be as easy as possible.  *See*, *e.g.*, *Bartlett*, pp. 22-23.

###### C. Plaintiff's Relationship with Defendant Smith

Plaintiff was incarcerated at the ORW from November 7, 2008 until May 1, 2009.  *Raneri Declaration*, ¶ 6; *Affidavit of Dorothea Reynolds*, ECF 106-1, ¶ 3 ("*Plaintiff Affidavit*").  During this incarceration, she was housed in a unit known as "Shirley 1," which is where defendant Smith worked.  *Plaintiff Affidavit*, ¶ 4.  On approximately February 25, 2009, plaintiff's cell was searched and a letter from plaintiff addressed to defendant Smith was found ("the letter").  *Id.* at ¶ 5.  On March 2, 2009, defendant Cynthia Bartlett spoke with plaintiff, who had been placed in "Arn 4," *i.e.*, segregation, because of the letter.  *Id*. at ¶ 6; *Bartlett Deposition*, pp. 40-41.  Plaintiff told defendant Bartlett that defendant Smith had kissed her and had touched her buttocks.  *Plaintiff Affidavit*, ¶ 6; *Bartlett Deposition*, p. 41.  Defendant Bartlett advised that plaintiff was defendant Smith's "type" "and that they had been trying to catch him for doing things like this for years."  *Plaintiff Affidavit*, ¶ 6.

Plaintiff underwent a certified voice stress test ("CVSA") which addressed the topics of cigarettes, tobacco and whether defendant Smith had touched and kissed her.  *Deposition of Patrol Sergeant*

*Trooper Gamel S. Brimah*, ECF 102-1, pp. 33-35 ("*Brimah Deposition*").[9]
The test results indicated that plaintiff had been truthful. *Id*. at
34-35, 41.

Defendant Bartlett instructed plaintiff to report to her any
additional incidents involving defendant Smith. *Plaintiff Affidavit*,
¶ 7; *Bartlett Deposition*, p. 42. She also gave plaintiff a phone
number and told plaintiff to check in on a weekly basis. *Bartlett
Deposition*, p. 42. When defendant Bartlett asked if plaintiff was
afraid to return to her cell area, plaintiff responded, "No." *Id*.
When plaintiff was released from Arn 4, she was returned to her unit,
Shirley 1, which was monitored by defendant Smith. *Plaintiff
Affidavit*, ¶ 8. Defendant Bartlett did not speak with defendant Smith
after meeting with plaintiff while she was in segregation. *Bartlett
Deposition* pp. 43-44.

Plaintiff states that, after she returned to her unit, defendant
Smith indicated that he knew that she was working with investigators.
*Plaintiff Affidavit*, ¶ 9. He threatened to tell the other women in
the unit that plaintiff was incarcerated because of arson which,
according to defendant Smith, the other prisoners would not like. *Id*.
Defendant Smith's threat frightened plaintiff because she understood
it to mean that she would be subject to harassment and physical harm
from other prisoners if defendant Smith revealed that plaintiff was an

---

[9] Sergeant Brimah is an investigator with the Ohio State Highway Patrol who
administered at least one of plaintiff's CVSA tests at ORW. *Id*. at 8-10, 28-
29, 33-35. Although it is not immediately apparent from the record,
plaintiff represents that this test was taken on March 19, 2009. *Opposition*,
p. 1 (pagination appearing at bottom of the page).

arsonist. *Id*. at ¶¶ 9-10. Plaintiff asserts that, between approximately April 15 and April 27, 2009 defendant Smith forced plaintiff to perform oral sex on him on three occasions. *Id*. at ¶¶ 11, 15, 19; *Brimah Deposition*, p. 40. Plaintiff understood defendant Smith's threats to mean that she would be subject to additional sexual assaults and possible physical harm if she continued to talk to investigators. *Plaintiff Affidavit*, ¶ 20.

On April 30, 2009,[10] plaintiff was placed in Arn 4 (segregation) on disciplinary charges of embezzlement of money, using the telephone or mail in furtherance of criminal activity, and giving false information to staff. *Conduct Report*, ECF 98-4, PAGEID#:1054 (dated April 30, 2009). While she was in segregation, defendant Corrections Officer Calhoun, a friend of defendant Smith, allegedly threatened plaintiff "to keep [her] mouth shut about what Smith was doing." *Plaintiff Declaration*, ¶ 30. Plaintiff alleges that she feared retaliation by defendants Smith and Calhoun. *Id*. at ¶¶ 31-32.

On May 1, 2009, plaintiff reported the sexual assaults to Sergeant Althouse, who then contacted the Ohio State Highway Patrol. *Id*. at ¶¶ 33-34. The Ohio State Highway Patrol had not previously been contacted regarding plaintiff's allegations about defendant Smith. *Trim Deposition*, pp. 103-06. The Ohio State Highway Patrol assigned Sergeant Brimah to investigate plaintiff's allegations. *Bartlett Deposition*, p. 45; *Brimah Deposition*, p. 8. On May 5, 2009,

---

[10] As will be addressed *infra*, the parties disagree whether or not ORW investigators had any additional contact with plaintiff before April 30, 2009. *See Plaintiff Affidavit*, ¶¶ 12-13, 16-17, 21, 28-29; *Motion for Summary Judgment*, p. 7 (citing *Bartlett Deposition*, pp. 44-45).

11

plaintiff took a polygraph test regarding her allegations that defendant Smith forced her to perform oral sex on him. *Plaintiff Affidavit*, ¶ 35. These test results indicated that plaintiff's answers were truthful. *Id*. The Ohio State Highway Patrol thereupon transferred plaintiff out of ORW. *Id*. at ¶ 36; *Bartlett Deposition*, pp. 47-48.

On March 31, 2011, plaintiff filed this action with the assistance of counsel, naming ten (10) individual defendants. *Complaint*, ECF 1. This Court previously dismissed plaintiff's state court claims and her claims against defendants in their official capacities. *Order*, ECF 34. Defendants now move for summary judgment on plaintiff's remaining claims, contending that those claims were not timely filed and that defendants are entitled to qualified immunity because plaintiff failed to exhaust her administrative remedies. *See Motion*. Plaintiff opposes defendants' *Motion*, *see Opposition*, and with the filing of defendants' reply memorandum, *see* ECF 108 ("*Reply*"), this matter is now ripe for resolution.

## II. STANDARD

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). In making this determination, the evidence must be viewed in the light most favorable to the non-moving party.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  *Catrett,* 477 U.S. at 323.  Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial").  "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous

13

allegations.  It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'"  *Glover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, the non-moving party must support the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.  See also* Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

### A.  Statute of Limitations

In moving for summary judgment, defendants first argue that plaintiff's remaining claims under § 1983 are time-barred.  *Motion*, p. 10; *Reply*, pp. 10-11.  Defendants contend that plaintiff's claims arose on either February 25, 2009, when plaintiff's cell was searched and her letter to defendant Smith was discovered, or on March 2, 2009, when she was first interviewed by investigators.  *Motion*, p. 10

14

(citing *Complaint*, ¶¶ 22, 25); *Reply*, pp. 10-11.  Because the *Complaint* was filed more than two years later, on March 31, 2011, defendants argue that the action is untimely.  *Id*.  Plaintiff disagrees, contending that her claims, which are claims of failure to protect, did not accrue until she suffered harm.  *Opposition*, p. 24 (using pagination at bottom of the page).  Plaintiff specifically argues that she was first harmed on April 15, 2009, when defendants allegedly failed to protect plaintiff from defendant Smith's sexual assaults, and that her § 1983 claims are therefore timely.  *Id*. at 24-25.  In reply, the defendants argue that, in light of the fact that plaintiff placed ORW officials on notice of defendant Smith's violation of the Unauthorized Relationships Policy on March 2, 2009, "[i]t stands to reason that . . . she herself had knowledge of the same, even prior to February 25, 2009, or when correctional staff discovered her letter." *Reply*, p. 11.

Claims that arise in Ohio under 42 U.S.C. § 1983 must be initiated within two (2) years of the time the cause of action accrues.  *See Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (*en banc*).  In general, a civil rights claim for relief accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action.  *Eidson v. Tenn. Dep't of Children's Servs*., 510 F.3d 631, 635 (6th Cir. 2007); *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991).  "A plaintiff has reason to know of h[er] injury when [she] should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir.

1984).  "In this objective inquiry, courts look 'to what event should have alerted the typical lay person to protect his or her rights.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th 2005)).

The *Complaint* was filed on March 31, 2011; conduct that occurred before March 31, 2009 would therefore fall outside the statutory period.[11]  Plaintiff's claims of failure to protect arise out of defendant Smith's alleged sexual assaults beginning on April 15, 2009. *Opposition*, p. 24.  Because this action was filed within two years of that date, plaintiff's § 1983 claims are timely.

**B.   Exhaustion of Administrative Remedies**

Defendants next argue that plaintiff's claims cannot proceed because she failed to exhaust her administrative remedies before filing this action.  The Prison Litigation Reform Act requires that a prisoner filing a claim under federal law relating to prison conditions must first exhaust available administrative remedies. *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  The statute provides, in pertinent part:

> No action shall be brought with respect to prison conditions under [section 1983 of this title], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In order to satisfy this exhaustion requirement, an inmate

---

[11] Plaintiff does not argue that claims arising prior to March 31, 2009 are timely.  *See Opposition*, p. 24.

16

plaintiff must "complete the administrative review process in accordance with the applicable procedural rules[.]" *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  "Failure to exhaust is an affirmative defense under the PLRA, and [] inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Exhaustion is not a jurisdictional predicate but the requirement is nevertheless mandatory, *Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999), even if proceeding through the administrative procedure would appear to the inmate to be "futile." *Hartsfield v. Vidor*, 199 F.3d 305, 308-10 (6th Cir. 1999).

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code § 5120-9-31.  The procedure is available to an inmate "regardless of any disciplinary status, or other administrative or legislative decision to which the inmate may be subject," O.A.C. § 5120-9-31(D), and is intended to "address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant," including "complaints regarding policies, procedures, conditions of confinement, or the actions of institutional staff." O.A.C. § 5120-9-31(A).  Certain matters are not grievable, however, including "complaints unrelated to institutional life, such as legislative actions, policies and decisions of the adult parole authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies."  O.A.C. § 5120-9-31(B).

The grievance procedure established by O.A.C. § 5120-9-31

involves three (3) steps.  First, an inmate must file an informal complaint within fourteen days of the event giving rise to the complaint.  O.A.C. § 5120-9-31(K)(1).  The informal complaint must be addressed "to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint." *Id.*  If the informal complaint is resolved in a manner that is unsatisfactory to the inmate, she must file a notification of grievance with the inspector of institutional services within fourteen days. O.A.C. § 5120-9-31(K)(2).  If the inmate is dissatisfied with the disposition of the grievance, she must then appeal to the office of the chief inspector within fourteen days. O.A.C. § 5120-9-31(K)(3).  "The decision of the chief inspector or designee is final."  *Id.*  Remedies for valid grievances include "changes to institutional policies or procedures, the implementation of new policies or procedures, and/or corrective action specific to the inmate's complaint."  O.A.C. § 5120-9-31(L).  Dismissal without prejudice of a civil rights complaint is appropriate if a prisoner fails to first exhaust administrative remedies.  *See*, *e.g.*, *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Crump v. Darling*, No. 03-2086, 2005 U.S. App. LEXIS 29546, at *3-4 (6th Cir. July 6, 2005).

However, a prisoner need exhaust only those administrative remedies that are "available" to her.  *See*, *e.g.*, 42 U.S.C. § 1997e(a); *Napier v. Laurel County*, 636 F.3d 218, 222-23 (6th Cir. 2011).  A facility's alleged failure to explain the grievance policy does not excuse an inmate's failure to exhaust.  *See*, *e.g.*, *Napier*,

636 F.3d at 221-22 n.2 ("A plaintiff's failure to exhaust cannot be excused by his ignorance of the law or the grievance policy."). Whether a process is "available" under the PLRA frequently turns on whether a grievance procedure was available on its face even if the prisoner subjectively believes that the procedure would be futile. *Id*. at 224.  Courts have found a grievance procedure "unavailable" when prison officials "have somehow thwarted" an inmate's attempts at exhaustion.  *Brock v. Kenton County*, No. 02-5442, 93 Fed. Appx. 793, at *798 (6th Cir. Mar. 23, 2004).  *See also Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 578 (6th Cir. 2014) ("[W]e have excused a prisoner's lack of complete compliance when the improper actions of prison officials render the administrative remedies functionally unavailable.").  Nevertheless, the prisoner must still "make some affirmative efforts to comply with the administrative procedure" before a court will consider whether the procedure was unavailable. *Brock*, 93 Fed. Appx. 793, at *798.  *See also Napier*, 636 F.3d at 223 ("The Sixth Circuit requires some affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.") (internal quotation marks and citations omitted).  Courts analyze "whether an inmate's efforts to exhaust were sufficient under the circumstances[.]"  *Id*. at 224.  In making this determination, courts consider whether a reasonable jury could conclude that defendants' actions and/or statements "would deter a person of ordinary firmness from continuing with the grievance process."  *Himmelreich,* 766 F.3d at 578.

19

In the case presently before the Court, plaintiff argues that the inmate grievance procedure was not "available" to her for three reasons.  First, she contends that sexual assaults were not subject to the inmate grievance procedure.  *Opposition*, pp. 9-12.  Even if such assaults were subject to that procedure, plaintiff next argues that her alleged failure to exhaust was excused because defendants thwarted her attempts to comply.  *Id.* at 12-21.  Finally, plaintiff contends that she was afraid to file a written grievance because defendants Smith and Calhoun threatened her.  *Id.* at 21-23.  Defendants take the position that plaintiff's claims were subject to the grievance procedure and that plaintiff, who was counseled on how to use that procedure, should not be excused for failing to exhaust her administrative remedies.  *Motion*, pp. 8-10; *Reply*, pp. 2-10.

This Court declines, under the particular facts of this case, to determine whether plaintiff's claims are subject to the usual inmate grievance procedure established by O.A.C. § 5120-9-31. The information provided to plaintiff upon her admission to ORW created, at the very least, ambiguity as to the proper method of reporting complaints of sexual misconduct or assault.  *See, e.g., Raneri Deposition*, pp. 39-41.

Even assuming that sexual assaults fall within the scope of the grievance procedure established by O.A.C. § 5120-9-31, the Court concludes that the record reflects a genuine issue of material fact regarding plaintiff's compliance with those procedures or defendants' waiver of her obligation to pursue those procedures.  As noted *supra*,

20

plaintiff was advised that she could report a sexual assault by, *inter alia*, calling a hotline or telling a staff member.  Plaintiff avers that she met with investigators after the first alleged assault and that she was told to report assaults by telephone.  *Plaintiff Affidavit*, ¶¶ 12-13.  The investigators allegedly assured plaintiff that "the sexual assault reporting phone number would go directly to them [,] that it was the right procedure to follow to report sexual assaults" and that "it was the safest procedure to follow."  *Id*. at ¶ 13.  Plaintiff alleges that she in fact utilized that procedure following the alleged second assault.  *Id*. at ¶ 16.  When she met with investigators, they advised her to call the number they gave her if he assaulted her again and that she should obtain evidence of any future assault:

> Investigators came and met with me again to discuss Smith. The investigators told me again that the way to report sexual assaults was to call the number they gave me. However, this time, investigators also told me to try to get evidence of the sexual assaults.  They suggested that after he forces me to perform oral sex and ejaculates, that I should spit his semen into a towel and keep it to give to them.

*Id*. at ¶ 17.  After defendant Smith allegedly assaulted plaintiff a third time, plaintiff alleges that she called the number given to her to report the alleged assault.  *Id*. at ¶¶ 19, 21.

Defendants point to evidence that plaintiff did not approach corrections staff about any alleged sexual assaults until April 30, 2009, when she was placed in segregation for unrelated misconduct. *Motion*, p. 7; *Reply*, pp. 3, 5-6 (citing "Ohio State Highway Patrol

Report of Investigation Investigative Notes," ECF 108-1). *See also Bartlett Deposition*, pp. 42, 44-45. This evidence establishes only that, at this stage of the proceedings, there exists a genuine issue of material fact and that summary judgment on this issue is unwarranted.

Plaintiff also contends that she was afraid to put information about defendant Smith's sexual assaults in writing because he had threatened her on multiple occasions and she feared that he would retaliate against her. *Plaintiff Affidavit*, ¶¶ 9-10, 19-20, 26-27, 32. She also feared retaliation from defendant Calhoun, defendant Smith's friend who also allegedly threatened her. *Id.* at ¶¶ 30-32. Although defendants dispute the credibility of plaintiff's claimed fear of retaliation, *Reply*, pp. 8-9, defendant Smith's "retaliation and intimidation — if proven true — would render the grievance process functionally unavailable for a person of ordinary firmness." *See Himmelreich*, 766 F.3d at 578.

In short, and construing this evidence in a light most favorable to plaintiff, the Court concludes that there remains a genuine issue of material fact as to whether the grievance process was, under the circumstances alleged by plaintiff, available to her.[12]

**WHEREUPON**, it is **RECOMMENDED** that *Defendants' Motion for Summary Judgment As It Pertains to the Mandatory Precondition of Exhaustion of Administrative Remedies Pursuant to the Prison Litigation Reform Act*

---

[12] To the extent that defendants argue that, because "Plaintiff has failed to satisfy statutory mandates, she has not, nor can she, defeat Defendants' entitlement to qualified immunity[,]" *Motion*, p. 10, that argument is not well-taken for the reasons discussed *supra*.

("*PLRA*") of 42 U.S.C. § 1997e, ECF 98, be **DENIED**.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


May 1, 2015                              *s/Norah McCann King*
                                    Norah M<sup>c</sup>Cann King
                                United States Magistrate Judge